## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ARROW GEAR COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | FILED: AUG 26, 2008 |
| DOWNERS GROVE SANITARY DISTRICT; | ) | 08CV4895 |
| CHASE-BELMONT PROPERTIES, LLC; | ) | JUDGE LINDBERG |
| AMERICAN NATIONAL BANK AND TRUST | ) | MAGISTRATE JUDGE COX |
| COMPANY OF CHICAGO (n/k/a JPMorgan | ) | |
| Chase Bank NA) AS TRUSTEE | ) | |
| UNDER TRUST No. 30797; CITIZENS | ) | AO |
| NATIONAL BANK OF DOWNERS GROVE | ) | |
| GROVE (n/k/a U.S. BANK NATIONAL | ) | |
| ASSOCIATION) AS TRUSTEE UNDER | ) | |
| TRUST No. 2398; LASALLE BANK NATIONAL | ) | |
| ASSOCIATION AS SUCCESSOR TRUSTEE | ) | |
| UNDER TRUST AGREEEMENT DATED | ) | |
| 10/14/80 AND KNOWN AS TRUST No. 2398, | ) | |
| NOW KNOWN AS TRUST No. B7900239830; | ) | |
| LOVEJOY, INC.; and RHI HOLDINGS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

NOW COMES the Plaintiff, Arrow Gear Company, by and through its attorneys, the Law

Offices of Carey S. Rosemarin, P.C. and Lynch & Stern LLP, and for its Complaint against

Defendants Downers Grove Sanitary District; Chase-Belmont Properties, LLC; American

National Bank and Trust Company of Chicago (n/k/a JPMorgan Chase Bank NA) as Trustee

under Trust No. 30797; Citizens National Bank of Downers Grove (n/k/a U.S. Bank National

Association) as Trustee under Trust No. 2398; LaSalle Bank National Association as Successor

Trustee under Trust Agreement dated 10/14/80 and known as Trust No. 2398, now known as

Trust No. B7900239830; Lovejoy, Incorporated; and RHI Holdings, Incorporated, states as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this civil action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601, et seq. and the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/1, et seq.

2.      Plaintiff seeks from the Defendants costs of response incurred by Plaintiff consistent with the National Contingency Plan. 40 C.F.R. Part 300. Such costs were caused by the release or threatened release of hazardous substances at and/or from Defendants' facilities in Downers Grove, Illinois. Plaintiff also seeks a declaratory judgment on liability for response costs pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. §§ 2201 and 2202, declaring Plaintiff's right to recover past and future costs for the release of hazardous substances at and/or from the facilities in Downers Grove, Illinois.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action and the parties hereto pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), 28 U.S.C. § 1331, and pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367. In addition, the Declaratory Judgment Act, 28 U.S.C. § 2201, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), authorize this Court to grant Plaintiff declaratory relief.

4.      Venue is proper in the United States District Court of the Northern District of Illinois, Eastern Division, pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391, and because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, the releases or threatened releases of hazardous

substances occurred in this District, and/or each Defendant resides, may be found, and/or has its principal place of business in this District.

## THE PARTIES

5.      Plaintiff Arrow Gear Company ("Arrow Gear") is a Delaware corporation that operates a factory located at 2301 Curtiss Street, Downers Grove, Illinois.

6.      Defendant Downers Grove Sanitary District ("DGSD") is an Illinois municipal corporation, which at all relevant times owned, operated, and/or otherwise controlled a sewage treatment works in Downers Grove, comprised of a sewage treatment plant, a network of sanitary sewer lines, and associated structures and equipment.

7.      Defendant Chase-Belmont Properties, LLC, an Illinois limited liability company, is the beneficial owner, and American National Bank and Trust Company of Chicago (n/k/a JPMorgan Chase Bank NA) as Trustee under Trust No. 30797, Citizens National Bank of Downers Grove (n/k/a U.S. Bank National Association) as Trustee under Trust No. 2398, and LaSalle Bank National Association as Successor Trustee under Trust Agreement dated 10/14/80 and known as Trust No. 2398, now known as Trust No. B7900239830, were at all relevant times the legal owners of property located at 5000-5111 Chase Avenue, Downers Grove, Illinois (collectively, "Chase-Belmont").

8.      Defendant Lovejoy, Incorporated ("Lovejoy") is an Illinois corporation that at all relevant times owned, operated, and/or otherwise controlled the property located at 2655 Wisconsin Avenue, Downers Grove, Illinois.

9.      Defendant RHI Holdings, Incorporated ("RHI") is a Delaware corporation that at all relevant times owned, operated, and/or otherwise controlled the property located at 2324 and 2400 Curtiss Street, Downers Grove, Illinois.

## FACTUAL BACKGROUND

**A.**     *The Ellsworth Industrial Park and the Nearby Residents*

10.     At all times relevant to this matter, Arrow Gear occupied the property known as 2301 Curtiss Street, Downers Grove, Illinois 60515.  The Arrow Gear property and all of the Defendants' facilities are located in an area known as the Ellsworth Industrial Park (the "Park").

11.     The Park was originally developed in the 1950s.  Prior to that time, the land was used for agricultural purposes.  Currently, approximately 135 manufacturers and other types of businesses are located in the Park.

12.     The Park is bounded by Burlington Avenue to the north, Belmont Road to the east, Elmore and Inverness Avenues to the south, and I-355 to the west.

13.     St. Joseph Creek traverses the Park, flowing east to west.  It enters the Park near the intersection of Belmont Avenue and Curtiss Avenue, and continues west/northwest to the DGSD sewage treatment plant, located in the northwest portion of the Park.

14.     The areas to the southeast, south, southwest and west of the Park include numerous residences, mostly comprised of single-family homes.  Until recently, the source of potable water for these residences was groundwater.

15.     Groundwater in the vicinity of the Park is located at various depths.  Some of the groundwater is located in the unconsolidated material overlying the regional bedrock.  Such overlying material is known as the "overburden."  The overburden consists of primarily low-permeability material, but it contains areas of higher permeability which are hydraulically connected to the bedrock aquifer.  The U.S. Geological Survey ("USGS") defines the term "aquifer" as "a geologic formation(s) that is water bearing.  A geological formation or structure that stores and/or transmits water, such as to wells and springs.  Use of the term is usually

restricted to those water-bearing formations capable of yielding water in sufficient quantity to constitute a usable supply for people's uses."[1]   The groundwater in the overburden is not consistent with this definition, and thus does not constitute an aquifer.

16.     An aquifer does exist within the bedrock underlying the region of the Park.  The bedrock is located in the range of approximately 50-100 feet below the surface (and beneath the overburden).

17.     The USGS defines bedrock as "the solid rock beneath the soil and superficial rock," and notes that it is a "general term for solid rock that lies beneath soil, loose sediments, or other unconsolidated material."[2]

18.     The private wells that served the respective homes in the vicinity of the Park drew water from the regional bedrock aquifer.

19.     As a result of reports of contaminated water in Lisle, a neighboring town, residents of Downers Grove contacted the Illinois Environmental Protection Agency ("IEPA") about their water.

20.     In 2001, the IEPA sampled about 500 private wells. Laboratory analyses showed elevated levels of contaminants, including trichloroethylene ("TCE"), perchloroethylene ("Perc") and 1,1,1 trichloroethane ("TCA"), all of which are common industrial chlorinated solvents. And, all three chemicals are hazardous substances as that term is defined by CERCLA. 42 U.S.C. § 9601(14).  The lab tests showed that some of the wells were not contaminated.  But they also showed that others were, sometimes at levels exceeding those which the government considered safe for human consumption.

---

[1] http://ga.water.usgs.gov/edu/dictionary.html#A.
[2] http://ga.water.usgs.gov/edu/dictionary.html#B.

21.     Subsequently, IEPA collaborated with the U.S. Environmental Protection Agency ("USEPA") in collecting additional soil and groundwater samples from various locations in the Park, the suspected source of the residents' water contamination.

**B.     *The PRPs' Extension of Lake Michigan Water to the Residents – the First AOC***

22.     The results of the various sampling efforts were contained in an August 2002 report by Weston Solutions, Inc. ("Weston"), a contractor of USEPA.  As shown in that report, a number of areas within the Park were shown to contain elevated levels of contaminants, including TCE, Perc, and TCA.  The contaminants were present in the soil and groundwater, including the bedrock aquifer.  The bedrock aquifer in the Park was the same geologic structure as the bedrock aquifer from which the Downers Grove residents drew their potable water.

23.     Also in August 2002, USEPA issued "general notice letters" to 15 entities located in the Park, including Arrow Gear.  The letters stated that USEPA had documented a release or threatened release of hazardous substances at the Park, and advised each recipient that it was a "potentially responsible party," or "PRP," under CERCLA.  The letter advised the PRPs that they could be held liable for the costs of the cleanup, or that USEPA could order them to clean up, and therefore "recommended" that they cooperate with one another to remediate the problem.

24.     Defendant DGSD was a recipient of the general notice letter, although the letter was not addressed to the other Defendants.

25.     In the summer and fall of 2002, the PRPs identified in the general notice letter entered into discussions with USEPA to resolve the matter, and on or about October 11, 2002, USEPA issued a "special notice letter" ("SNL 1") under Section 122(e) of CERCLA.  42 U.S.C. § 9622(e).  That section provides for a moratorium on further enforcement by USEPA, pending

submittal by the PRPs of a "good faith offer," to resolve the issue.  Accordingly, the PRPs met with USEPA and among themselves around that time.

26.    Very early in the process, USEPA made it known to the PRPs that it wanted them to provide an alternative water supply to the potentially affected residences.  Specifically, USEPA urged the PRPs to extend the existing Downers Grove municipal water distribution system, which uses water from Lake Michigan, to the residences.  It also demanded that the PRPs seal the residential wells.  SNL 1 included a "Statement of Work" that clearly identified those objectives.

27.    Defendants DGSD and RHI received the SNL 1, although Defendant Chase-Belmont did not.

28.    Following the issuance of the SNL 1, the PRPs discussed the issue extensively and met with representatives of both the Village of Downers Grove and DuPage County.  The PRPs submitted a good faith offer, and ultimately, a plan was agreed upon by which the PRPs collectively committed to spend up to $4.275 million to provide an "alternative water supply" to the residents by extending the Downers Grove municipal water distribution system, as urged by USEPA.  The commitment was memorialized in a document entitled, "Administrative Order by Consent Pursuant to Section 106 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9606."  ("AOC 1").  It was signed by the PRPs, and USEPA signed on August 8, 2003.

29.    Arrow Gear signed AOC 1, and paid a portion of the $4.275 million, which is subject to readjustment at a later date.  This sum was used by the PRPs to extend the municipal water system, connect each of the allegedly affected residences to the new source of water, and pay associated costs.  The provision of the alternative water supply was a permanent remedy to

the alleged problem of residents' exposure to contaminated well water.  It was a remedial action, as that term is defined in CERCLA.  42 U.S.C. § 9601(24).  Arrow Gear's payment, and the amounts paid by other signatories to AOC 1 to fund the provision of the alternative water supply, were costs of response, as that term is defined in  42 U.S.C. § 9601(25).  These costs of response were necessary and consistent with National Contingency Plan.

30.    Neither DGSD nor any of the other Defendants signed AOC 1.  None of them paid any part of the costs of response relating to AOC 1.

31.    The provision of the alternative water supply contemplated by AOC 1 was completed on or about March 15, 2005.  As of that date, all affected residences had Lake Michigan water flowing through their taps, and their former potable wells were sealed – all at a cost paid for by the signatories to AOC 1.

32.    In addition to the $4.275 million, USEPA may impose other costs on the signatories to AOC 1.  For example, USEPA may seek to recoup its costs (such as the costs of the August 2002 Weston study) from the signatories to AOC 1.

33.    Other costs that USEPA may seek to recoup from the AOC 1 signatories may include the costs of a "screening study" that USEPA conducted in 2004.  A considerable amount of technical data was collected by USEPA in that study to find the source(s) of the contamination.  This effort was a prelude to the more formal effort known as the "remedial investigation/feasibility study" or "RI/FS."

**C.    *The PRPs' Payment to USEPA to conduct the RI/FS – the Second AOC***

34.    In pertinent part, USEPA's regulations define "remedial investigation" as a process undertaken "to determine the nature and extent of the problem presented by the release

[of hazardous substances]."  40 C.F.R. § 300.5.  The regulations define "feasibility study" as a study to "develop and evaluate options for remedial action."  40 C.F.R. § 300.5.

35.     USEPA demanded that the PRPs conduct, or pay USEPA to conduct, the RI/FS. A second special notice letter was sent to the PRPs for that purpose on or about December 24, 2004 ("SNL 2").  The recipients of SNL 1 and SNL 2 largely overlapped, but were not identical. Arrow Gear received SNL 2, as did all of the Defendants except DGSD.

36.     Activities following the issuance of SNL 2 were roughly analogous to the events following SNL 1.  That is, the PRPs negotiated both with USEPA, and among themselves, submitted good faith offers to USEPA, and ultimately, collectively committed to pay up to $1 million for the RI/FS.  This agreement was embodied in a document entitled, "Administrative Settlement Agreement and Order Pursuant to Sections 104, 107 and 122 of CERCLA" ("AOC 2"), which was signed by USEPA on September 29, 2005.

37.     Arrow Gear signed AOC 2 and paid a portion of the $1 million, as did Defendants Chase-Belmont, Lovejoy, and RHI.  These payments by Arrow Gear, Chase-Belmont, Lovejoy, and RHI are subject to readjustment at a later date.  On the other hand, Defendant DGSD did not sign AOC 2 and did not pay any portion of the $1 million.

38.     AOC 1 and AOC 2 differed in a material respect.  Under AOC 1 the PRPs directly paid for the installation of the alternative water supply; the PRPs incurred the response costs themselves.  But under AOC 2, USEPA undertook the task of preparing the RI/FS and the PRPs reimbursed the government for the costs it incurred.

39.     The purpose of an RI/FS is to assess and evaluate the release or threat of release of hazardous substances.  As such, the RI/FS itself fits within the definition of "removal action," as that term is defined in 42 U.S.C. § 9601(23).  Arrow Gear paid USEPA a portion of the costs

it expended to conduct the RI/FS.  Arrow Gear's payments were costs of response, as that term is defined in 42 U.S.C. § 9601(25).

40.     On information and belief, the costs of the RI/FS exceeded the $1 million cost that the AOC 2 signatories agreed to pay.  USEPA may pursue the AOC 2 signatories for the additional costs, as well as other costs associated with this effort.

41.     In September 2007, USEPA published the data collected under the RI/FS effort.

**D.     *What the data show***

42.     The purpose of an RI/FS is to determine the sources and extent of contamination and evaluate cleanup options.   Toward that end, USEPA, through its contractor, Weston, collected a tremendous amount of data under the RI/FS.   About 2,300 soil samples, 200 groundwater samples, 100 passive gas samples, and 75 utility corridor samples were collected and analyzed in the laboratory.  The data collected in 2006 and 2007, pursuant to the RI/FS, provided a far more complete understanding of the location of the sources of contamination and its migration than the previous data collection efforts.  The types of data collected included soil samples at various depths (including soil samples collected beneath the floors of buildings in the Park), groundwater samples (from both the overburden and bedrock aquifer), soil gas samples, and gas samples from the interiors of the sanitary and storm sewers.

43.     The data showed that chlorinated solvents were present on the properties of each of the Defendants.  Chlorinated solvents were used in and/or released from the facilities of each of the Defendants.

44.     The data further showed that chlorinated solvents were released from each of the Defendants' facilities into the soil in the Park.

45.     Chlorinated solvents that were released to the soil in the Park migrated; they were transported by precipitation and gravity.  They either migrated to the shallow groundwater, if there was any in the path of the contaminants, or to deeper soils.  In either event, the contaminants ultimately migrated to the bedrock aquifer.

46.     The rate of contaminant migration depends upon such factors as the type of soil, the nature of the contaminants and the mass and volume released.  In general, as the mass and volume of contamination increase, the downward rate of migration also increases.

47.     Part of the RI/FS data collection involved gathering samples of gas from the interiors of the sanitary sewers and storm sewers.  The majority of the sewer gas samples collected in the RI/FS effort were collected from the sanitary sewers.  All such samples were collected from within the Park.

48.     The sanitary sewer system serves the entire Park.  And, at least two companies in the Park reported to DGSD in 1995 and 2000 they used chlorinated solvents that could have discharged into the sanitary sewers.  The utility corridor gas samples collected by Weston from the interior of the sewage pipes, including the sanitary sewer pipes, showed elevated concentrations of TCE, Perc, and TCA throughout the sanitary sewer system.

49.     The DGSD sewage treatment plant itself is located in the northwest portion of the Park.  But another major part of the DGSD facility, the collection system, extends throughout a much larger area.  The collection system is partially comprised of a network of subsurface pipes that collect sewage from all buildings in the Park that lie south of St. Joseph Creek, and then transport it by gravity flow to a manhole near the northwest portion of the Arrow Gear property.

50.     The manhole is on Curtiss Avenue, near the entrance to Arrow Gear's parking lot. It is immediately west and south of St. Joseph Creek, where the creek turns north, crosses Curtiss Avenue, and continues northwest.

51.     The manhole serves as the entrance to a sub-surface structure known as a "siphon."  The purpose of the siphon is to transport the sewage by hydraulic force across the creek.  Thus, the sewage enters the manhole and siphon, flows downward about ten feet, crosses beneath the creek, and flows upward about ten feet on the other side.  It is then routed northwest to the sewage treatment plant, roughly parallel to the creek.

52.     DGSD owns and/or operates the treatment plant, the collection system, the siphon and all related structures.

53.     The utility corridor gas samples collected by Weston from the interior of the sewage pipes, including the sanitary sewer pipes, showed that the highest concentrations of chlorinated solvents in the sewer gases exist in the area of the inlet to the siphon.

54.     Siphons are widely used in sewer systems throughout the United States, and are also widely known to be prone to frequent clogs and backups if not properly maintained.  That was true of DGSD's siphon in the Park.  On at least two occasions (on or about July 9, 1999, and April 25, 2000), the siphon experienced "dry weather overflows," referring to a release of the sewer contents in the absence of precipitation.  The overflows were caused by clogs in the siphon.  The clogs led to sewage backing up and overflowing out of "upstream" manholes.

55.     As a result of the overflows, sewage containing chlorinated solvents that did not originate from the Arrow Gear property was released on to the Arrow Gear property.

56.    The RI/FS data show high concentrations of chlorinated solvents in the soil and groundwater on the Arrow Gear property in the vicinity of the siphon that did not originate from the Arrow Gear property.

57.    The portion of the Arrow Gear property closest to the siphon is Arrow Gear's front parking lot.  That area is at the farthest point on the Arrow Gear property from Arrow Gear's manufacturing operations and is an area in which Arrow Gear has never conducted any manufacturing operations.  The concentrations of chlorinated solvents in this area constitute releases of hazardous substances from the DGSD siphon.

58.    DGSD was aware that others in the Park were causing chlorinated solvents to be deposited in DGSD's sewer system.  DGSD and the other Defendants caused this release; Arrow Gear did not.

## COUNTS I – IV: AOC 1 RESPONSE COSTS – ALL DEFENDANTS

### COUNT I

**AOC 1: Cost Recovery Pursuant to CERCLA § 107(a)**

**Applies to All Defendants**

59.    Paragraphs Nos. 1 through 58 as alleged are incorporated and realleged herein as Paragraph No. 59 of Count I as though fully set forth herein.

60.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607 (a), any person may seek recovery of its response costs, that are both necessary and consistent with the National Contingency Plan, to investigate, remove, and/or remediate the release of hazardous substances,

from any other person who is liable for the release of hazardous substances under Section 107(a) of CERCLA. 42 U.S.C. § 9607(a).

61.    Section 107(a) of CERCLA imposes liability upon persons for the release of hazardous substances who were and/or continue to be owners and/or operators of a facility. 42 U.S.C. §§ 9607(a)(1) and (a)(2). In addition, Section 107(a) of CERCLA imposes liability upon persons who "by contract, agreement or otherwise arranged for the disposal" of hazardous substances at a facility. 42 U.S.C. § 9607(a)(3).

62.    Each Defendant is a "person" as defined by Section 101(21) of CERCLA. 42 U.S.C. § 9601(21).

63.    Each of the Defendants were and/or continue to be "owners" and/or "operators" of a "facility" and a portion of a "facility," within the meanings of Sections 101(20), 101(9), and 107(a)(1) and (a)(2) of CERCLA. 42 U.S.C. §§ 9601(20), 9601(9), and 9607(a)(1), (a)(2).

64.    Each of the Defendants by contract, agreement or otherwise, disposed of or arranged for disposal of hazardous substance that they owned or possessed at a facility, within the meaning of Section 107(a)(3) of CERCLA. 42 U.S.C. § 9607(a)(3).

65.    The "facilities" relevant to this Complaint include, but are not limited to, the Park and the areas of contaminated groundwater in the vicinity of the Park and each of the properties owned and/or controlled by Defendants, including but not limited to DGSD's siphon and related structures (collectively, "Facilities").

66.    The hazardous substances used, stored, and/or located at, in, on, and/or under the Facilities were and are "hazardous substances," within the meaning of Section 101(14) of CERCLA. 42. U.S.C. § 9601(14).

67.    The presence of chlorinated solvents in the soil and groundwater at the Facilities constitute "releases" or "threatened releases" of "hazardous substances" into the environment within the meaning of Sections 101(14), 101(22), and 107(a) of CERCLA. 42 U.S.C. §§ 9601(14), 9601(22), and 9607(a).

68.    Each Defendant is strictly liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), because each Defendant is the current owner or operator of a facility, and/or because each Defendant owned or operated a facility at the time hazardous substances were released into the environment, and/or by contract, agreement or otherwise, disposed of or arranged for disposal of hazardous substances owned or possessed by each Defendant at a facility.

69.    The releases of hazardous substances at and/or from the Facilities have caused and may continue to cause Arrow Gear to incur "response" costs within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), including but not limited to, Arrow Gear's share of the $4.275 million for completing the alternative water supply and the August 2002 Weston study.

70.    Such response costs incurred, and to be incurred, were and are necessary and consistent with the National Contingency Plan pursuant to 40 C.F.R. Part 300.

WHEREFORE, the Plaintiff, Arrow Gear, respectfully prays this Court enter a judgment that Defendants Downers Grove Sanitary District, Chase-Belmont Properties, LLC, Lovejoy, Incorporated, and RHI Holdings, Incorporated, are liable to Arrow Gear for response costs that Arrow Gear has and will incur in an amount to be determined at trial, the costs of this action, and any other or further relief this Court deems equitable and just.

## COUNT II

### AOC 1: Contribution Pursuant to CERCLA § 107(a)

#### Applies to All Defendants

71.     Paragraphs Nos. 1 through 70 as alleged are incorporated and realleged herein as Paragraph No. 71 of Count II as though fully set forth herein.

72.     Defendants are liable for all response costs caused by the releases or threatened releases at and/or from the Facilities under Section 107(a) of CERCLA.  42 U.S.C. § 9607(a).

73.     To the extent that Arrow Gear is found liable for any of the response costs associated with AOC 1, then pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the Defendants are liable in contribution to Arrow Gear for the costs of response incurred or to be incurred by Arrow Gear as a result of the release or threatened release of hazardous substances in connection with the above alleged Section 107(a) CERCLA claim.  42 U.S.C. § 9607(a).

WHEREFORE, the Plaintiff, Arrow Gear, to the extent it is found liable for response costs associated with AOC 1, respectfully prays this Court apportion such costs that Arrow Gear has incurred and will incur under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), among Defendants Downers Grove Sanitary District, Chase-Belmont Properties, LLC, Lovejoy, Incorporated, and RHI Holdings, Incorporated, and grant any other relief this court deems equitable and just.

## COUNT III

### AOC 1: CERCLA Declaratory Judgment

#### Applies to All Defendants

74.     Paragraphs Nos. 1 through 73 as alleged are incorporated and realleged herein as Paragraph No. 74 of Count III as though fully set forth herein.

75.    Each of the Defendants is liable under Section 107(a) of CERCLA.

76.    Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2), Federal Rule of Civil Procedure 57, and 28 U.S.C. §§ 2201 and 2202, Arrow Gear is entitled to a declaratory judgment on Defendants' liability for response costs and/or damages arising from the release of hazardous substances.

WHEREFORE, the Plaintiff, Arrow Gear Company, respectfully prays this Court enter a declaratory judgment, in accordance with 42 U.S.C. §§ 9607(a) and 9613(g)(2) and as provided by Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, that Defendants Downers Grove Sanitary District, Chase-Belmont Properties, LLC, Lovejoy, Incorporated, and RHI Holdings, Incorporated, are liable to Arrow Gear for any and all response costs and damages that will be binding on any subsequent action or actions (including arbitration) to recover any further response costs and/or damages, the repayment of attorney fees and costs incurred in connection with this suit against Defendants, and any other relief the Court deems equitable and just.

### COUNT IV

### AOC 1: Illinois Joint Tortfeasor Contribution Act

### Applies to All Defendants

77.    Paragraphs Nos. 1 through 58 as alleged are incorporated and realleged herein as Paragraph No. 77 of Count IV as though fully set forth herein.

78.    Under the Illinois Environmental Protection Act, 415 ILCS 5/1, et seq.:

i.    "No person shall [c]ause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with

matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act," 415 ILCS 5/12(a);

ii. "No person shall [d]eposit any contaminants upon the land in such place and manner so as to create a water pollution hazard," 415 ILCS 5/12(d);

iii. "No person shall [c]ause or allow the open dumping of any waste," 415 ILCS 5/21(a);

iv. "No person shall [d]ispose, treat, store, or abandon any waste . . . , except at a site or facility which meets the requirements of this Act and of regulations and standards thereunder," 415 ILCS 5/21(e); and/or

v. Any person shall be liable who owns and/or operates "a facility or vessel from which there is a release or substantial threat of release of a hazardous substance," owned and/or operated a facility at the time hazardous substance were disposed "from which there was a release or substantial threat of release of such hazardous substances," and/or by contract, agreement or otherwise, disposed of or arranged for disposal of "hazardous substances . . . owned, controlled or possessed by such person at a facility owned or operated by another party from which facility there is a release or substantial threat of a release of such hazardous substances." 415 ILCS 5/22.2(f).

79.    For the purposes of this Count IV, each of the Defendants is a "person" within the meaning of 415 ILCS 5/3.315.

80.     For purposes of this Count IV, the Park and the areas of contaminated groundwater in the vicinity of the Park, and each of the properties owned and/or controlled by Defendants, including but not limited to DGSD's siphon and related structures, is a "facility" within the meaning of 415 ILCS 5/22.2(h) and is also a "site" within the meaning 415 ILCS 5/3.460 (collectively, "Facilities").

81.     For purposes of this Count IV, the chlorinated solvents released from the Facilities into the soil and groundwater are "contaminants" within the meaning of 415 ILCS 5/3.165 and "hazardous substances" within the meaning of 415 ILCS 5/3.215 (collectively, "Hazardous Substances").

82.     Subsequent to March 1, 1978, each of the Defendants contaminated or polluted the Facilities by spilling, "releasing," threatening releases, discharging, threatening discharges, "disposing," and/or otherwise improperly handling Hazardous Substances within the meaning of 415 ILCS 5/3.165, 5/3.185, 5/3.215, and 5/3.395.

83.     Due to the releases of Hazardous Substances at and/or from the Facilities after March 1, 1978, contamination was, is, and continues to be located in the soil and groundwater at, under, and/or near the Facilities.

84.     Pursuant to 415 ILCS 5/12(a), 12(d), 21(a), 21(e), and/or 22.2(f), each of the Defendants are liable or potentially liable for the releases to and contamination of the soil and groundwater at the Facilities.

85.     Such contamination was the basis for the issuance of AOC 1.  Arrow Gear has paid and may continue to incur  response costs related to AOC 1.

86.     None of the Defendants have paid for any of the response costs associated with AOC 1.

87.    To the extent that Arrow Gear is found liable for any of the response costs associated with AOC 1, pursuant to the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/1, et seq., Arrow Gear is entitled to contribution from Defendants in an amount equal to their proportionate share of liability.

WHEREFORE, Plaintiff, Arrow Gear, to the extent it is found liable for response costs associated with AOC 1, respectfully prays this Court enter a judgment against Defendants Downers Grove Sanitary District, Chase-Belmont Properties, LLC, Lovejoy, Incorporated, and RHI Holdings, Incorporated apportioning response costs in accordance with the Defendants' proportionate share of liability, and any other relief the Court deems equitable and just.

## COUNTS V – VIII: AOC 2 RESPONSE COSTS – DGSD ONLY

### COUNT V

### AOC 2: Contribution Under CERCLA § 113(f)(3)(B)

### Applies to Defendant DGSD Only

88.    Paragraphs Nos. 1 through 70 as alleged are incorporated and realleged herein as Paragraph No. 88 of Count V as though fully set forth herein.

89.    Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), any "person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person" liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), who is not a party to that administrative or judicially approved settlement.

90.     Defendant DGSD is liable for all response costs caused by the releases or threatened releases at the Facilities under Section 107(a) of CERCLA.  42 U.S.C. § 9607(a).

91.     Arrow Gear signed and fulfilled its commitments under AOC 2, and thereby resolved its liability to the United States for some or all of a response action or for some or all of the costs of such action in an administrative settlement.

92.     Defendant DGSD was not a party to AOC 2.

93.     To the extent that Arrow Gear is found liable for any of the response costs arising from or relating to AOC 2, then pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), Defendant DGSD is liable in contribution to Arrow Gear for costs of response incurred or to be incurred by Arrow Gear as a result of the release or threatened release of hazardous substances in connection with the above alleged Section 107(a) CERCLA claim. 42 U.S.C. § 9607(a).

WHEREFORE, the Plaintiff, Arrow Gear, to the extent it is found liable for response costs arising from or relating to AOC 2, respectfully prays this Court apportion such costs to Defendant Downers Grove Sanitary District, incurred under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), in accordance with Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), and grant any other relief this court deems equitable and just.

## COUNT VI

### AOC 2: Contribution Pursuant to CERCLA § 107(a)

### Applies to Defendant DGSD Only

94.     Paragraphs Nos. 1 through 70 as alleged are incorporated and realleged herein as Paragraph No. 94 of Count VI as though fully set forth herein.

95.    Defendant DGSD is liable for response costs caused by the releases or threatened releases at the Facilities under Section 107(a) of CERCLA.  42 U.S.C. § 9607(a).

96.    To the extent that Arrow Gear is found liable for any of the response costs associated with AOC 2, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendant DGSD is liable in contribution to Arrow Gear for costs of response incurred or to be incurred by Arrow Gear as a result of the release or threatened release of hazardous substances in connection with the above alleged Section 107(a) CERCLA claim.  42 U.S.C. § 9607(a).

WHEREFORE, Plaintiff, Arrow Gear, to the extent it is found liable for response costs arising from or related to AOC 2, respectfully prays this Court apportion such costs to Defendant Downers Grove Sanitary District incurred or to be incurred by Arrow Gear under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and grant any other relief this court deems equitable and just.

## COUNT VII

### AOC 2: CERCLA Declaratory Judgment

### Applies to Defendant DGSD Only

97.    Paragraphs Nos. 1 through 70 and 88 through 96 as alleged are incorporated and realleged herein as Paragraph No. 97 of Count VII as though fully set forth herein.

98.    Defendant DGSD is liable under Section 107(a) of CERCLA.  42 U.S.C. § 9607(a).

99.    Pursuant to 42 U.S.C. §§ 9607(a), 9613(f) and 9613(g), Federal Rule of Civil Procedure 57, and 28 U.S.C. §§ 2201 and 2202, Arrow Gear is entitled to a declaratory judgment on Defendant DGSD's liability for response costs and/or damages arising from the release of hazardous substances.

WHEREFORE, the Plaintiff, Arrow Gear, respectfully prays this Court enter a declaratory judgment, in accordance with 42 U.S.C. §§ 9607(a), 9613(f) and 9613(g), and as provided by Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, that Defendant Downers Grove Sanitary District is liable to Arrow Gear for any and all response costs and damages that will be binding on any subsequent action or actions (including arbitration) to recover further response costs and/or damages, and the repayment of attorney fees and costs incurred in connection with this suit against such Defendants, and any other relief the Court deems equitable and just.

**COUNT VIII**

**AOC 2: Illinois Joint Tortfeasor Contribution Act**

**Applies to Defendant DGSD Only**

100.    Paragraphs Nos. 1 through 58 as alleged are incorporated and realleged herein as Paragraph No. 100 of Count VIII as though fully set forth herein.

101.    Under the Illinois Environmental Protection Act, 415 ILCS 5/1, et seq.:

    i.  "No person shall [c]ause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act,"  415 ILCS 5/12(a);

    ii.  "No person shall [d]eposit any contaminants upon the land in such place and manner so as to create a water pollution hazard,"  415 ILCS 5/12(d);

iii.   "No person shall [c]ause or allow the open dumping of any waste,"  415 ILCS 5/21(a);

iv.   "No person shall [d]ispose, treat, store, or abandon any waste . . . , except at a site or facility which meets the requirements of this Act and of regulations and standards thereunder,"  415 ILCS 5/21(e); and/or

v.   Any person shall be liable who owns and/or operates "a facility or vessel from which there is a release or substantial threat of release of a hazardous substance," owned and/or operated a facility at the time hazardous substance were disposed "from which there was a release or substantial threat of release of such hazardous substances," and/or by contract, agreement or otherwise, disposed of or arranged for disposal of "hazardous substances . . . owned, controlled or possessed by such person at a facility owned or operated by another party from which facility there is a release or substantial threat of a release of such hazardous substances."  415 ILCS 5/22.2(f).

102.   For purposes of this Count VIII, Defendant DGSD is a "person" within the meaning of 415 ILCS 5/3.315.

103.   For purposes of this Count VIII, the Park and the areas of contaminated groundwater in the vicinity of the Park, and each of the properties owned and/or controlled by Defendant DGSD, including but not limited to DGSD's siphon and related structures, is a "facility" within the meaning of 415 ILCS 5/22.2(h) and is also a "site" within the meaning 415 ILCS 5/3.460 (collectively, "Facilities").

104.    For purposes of this Count VIII, the chlorinated solvents released from the Facilities into the soil and groundwater are "contaminants" within the meaning of 415 ILCS 5/3.165 and "hazardous substances" within the meaning of 415 ILCS 5/3.215 (collectively, "Hazardous Substances").

105.    Subsequent to March 1, 1978, Defendant DGSD contaminated or polluted the Facilities by spilling, "releasing," threatening releases, discharging, threatening discharges, "disposing," and/or otherwise improperly handling Hazardous Substances within the meaning of 415 ILCS 5/3.165, 5/3.185, 5/3.215, and 5/3.395.

106.    Due to the releases of Hazardous Substances at and/or from the Facilities after March 1, 1978, contamination was, is, and continues to be located in the soil and groundwater at, under, and/or near the Facilities.

107.    Pursuant to 415 ILCS 5/12(a), 12(d), 21(a), 21(e), and/or 22.2(f), Defendant DGSD is liable or potentially liable for the releases to and contamination of the soil and groundwater at the Facilities.

108.    Such contamination was the basis for the issuance of AOC 2.  Arrow Gear has paid and may continue to pay for response costs arising from and related to AOC 2.

109.    Defendant DGSD has not paid for any of the response costs arising from or related to AOC 2.

110.    To the extent that Arrow Gear is found liable for any of the response costs arising from or related to AOC 2, pursuant to the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/1, et seq., Arrow Gear is entitled to contribution from Defendant DGSD in an amount equal to its proportionate share of liability.

WHEREFORE, Plaintiff, Arrow Gear, to the extent it is found liable for response costs associated with AOC 2, respectfully prays this Court enter a judgment against Defendant Downers Grove Sanitary District apportioning response costs in accordance with this Defendant's proportionate share of liability, and any other relief the Court deems equitable and just.

Respectfully submitted,

Arrow Gear Company

By: ___/s/  Carey S. Rosemarin__
       One of its Attorneys

Carey S. Rosemarin    (ARDC No. 6181911)
Andrew J. Marks       (ARDC No. 6286796)
Law Offices of Carey S. Rosemarin, P.C.
500 Skokie Boulevard
Suite 510
Northbrook, Illinois  60062
(847) 897-8000

Avidan J. Stern       (ARDC No. 6201978)
Lynch & Stern LLP
150 South Wacker Drive
Suite 2600
Chicago, Illinois  60606
(312) 346-1600